**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**August 14, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP777-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2015CF467**

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JOHN R. PHELAN,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Columbia County: W. ANDREW VOIGT, Judge. *Reversed and cause remanded with directions.*

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

¶1 BLANCHARD, J. An on-duty conservation warden with Wisconsin Department of Natural Resources (DNR) stopped John Phelan's pickup truck on the suspicion that Phelan had littered. After an initial brief encounter with Phelan, the warden investigated whether Phelan had committed a different

offense: operating the pickup while impaired, possibly as a result of smoking marijuana. Eventually, the warden radioed a request for a local sheriff's deputy to come to the scene of the stop to perform a drug recognition test. Deputies responded to the scene, conducted further investigation, placed Phelan under arrest, and obtained his consent for a blood draw to test for potentially impairing substances.

¶2 Based on this incident, the State charged Phelan with criminal law violations that included operating a vehicle with a restricted controlled substance in his blood, specifically delta-9-tetrahydrocannabinol (THC), as a third offense. Phelan moved to suppress evidence, arguing that the warden could not arrest, detain, or investigate Phelan for any suspected law violation other than littering under applicable statutory provisions. After the circuit court denied the motion, Phelan was found guilty at a jury trial of operating with a restricted controlled substance in his blood and possession of drug paraphernalia. Phelan now appeals the denial of his motion to suppress.

¶3 This appeal calls for first-impression interpretations of WIS. STAT. § 29.921(1) and (5) (2023-24).[1] Generally speaking, DNR wardens have limited enforcement powers compared with the entire panoply available to sheriff's deputies and police officers, and the wardens' core enforcement powers are defined in § 29.921(1). However, § 29.921(5) expands the enforcement authority for those wardens who have completed a law enforcement training program and are certified as qualified to be a law enforcement officer. A certified warden who

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

is on duty and displays a sign of the warden's office may arrest any person anywhere in the state who "has committed a crime in the presence of the warden." § 29.921(5). At the same time, however, certified wardens "may not conduct investigations for violations of state law," except in identified circumstances. § 29.921(5).

¶4 The warden here was certified, but he did not need the certification to stop Phelan's pickup to investigate suspected littering. This is because all DNR conservation wardens may stop vehicles to enforce law violations specified by § 29.921(1), which include littering. *See* WIS. STAT. §§ 29.921(1) (providing authority for all conservation wardens to enforce enumerated statutes and rules), 23.50(1) (specifying one set of enforceable statutes and rules), 287.81(2)(a) (prohibiting littering), 29.924(1) (directing wardens to investigate violations of statutes and rules enumerated in § 29.921(1)).

¶5 The parties dispute whether the warden had authority to arrest Phelan. We conclude that, in the course of the warden's investigation of suspected littering authorized under WIS. STAT. § 29.921(1), the warden acquired authority under § 29.921(5) to arrest Phelan, and as a consequence had the authority to detain him, based on probable cause to believe that Phelan had committed the crime of possessing THC, in violation of WIS. STAT. § 961.41(3g)(e), while Phelan was in the warden's presence.

¶6 The parties also dispute whether the warden conducted an investigation prohibited by WIS. STAT. § 29.921(5) by subjecting Phelan to a series of tests and asking him questions related to driving while impaired, possibly based on marijuana use. We conclude that the warden violated the general prohibition on investigations in § 29.921(5), by conducting a solo investigation of impaired

driving. We further conclude that the appropriate remedy for the warden's prohibited solo investigation of suspected impaired driving is suppression of its evidentiary fruits.

¶7　Accordingly, we conclude that the circuit court erred to the extent that it did not suppress the evidence that the warden obtained during his solo investigation of impairment. But we also conclude that the court did not err in denying suppression of the evidence that the warden obtained before that, while investigating littering, nor did it err in denying suppression of evidence obtained by the deputies who were summoned by the warden, including the results of a chemical test of Phelan's blood that showed the presence of THC. We reverse the judgment of conviction and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶8　The background facts that we now summarize are not disputed on appeal.

*Warden's Testimony*

¶9　The only DNR conservation warden involved in this case, Ryan Volenberg, testified to the following during multiple suppression hearings and a jury trial.[2]

---

[2] The state employees appointed by the DNR who were formerly known as "deputy fish and game wardens" are now called "conservation wardens." WIS. STAT. § 23.10(1). The DNR conservation wardens discussed in this opinion are distinct from "state-certified commission wardens," a subcategory of "commission wardens," who are "conservation warden[s] employed by the Great Lakes Indian Fish and Wildlife Commission." *See* WIS. STAT. § 939.22(5), (22), (37). This opinion does not address any aspect of the authority of commission wardens.

¶10 The warden interacted with Phelan one evening in October 2015.[3] The warden was on duty and parked near a bridge on Lake Wisconsin in Columbia County. Fishing and littering were common activities in the area. The warden had been certified based on his completion of a law enforcement training program that gave him additional, but limited, enforcement authority under WIS. STAT. § 29.921(5), as addressed in the Discussion section below.

¶11 At approximately 9:45 p.m., the warden made observations that caused him to suspect that Phelan had tossed a can on the ground. This occurred on land that was not supervised, managed, and controlled by the DNR. *See* WIS. STAT. § 23.11(4) (granting the DNR "police supervision over all state-owned lands and property under its supervision, management[,] and control").[4] Phelan, not accompanied by anyone else, got into a pickup truck and drove away. The warden followed Phelan in an unmarked vehicle equipped with emergency lights, based on suspected littering.

¶12 The warden observed the following while following Phelan's pickup for about three minutes. The pickup weaved within its lane, crossed the center line at least four times, and crossed the fog line at least three times—despite the absence of any other vehicles on the road. This caused the warden to suspect that Phelan might be impaired by drugs, alcohol, or both. The warden activated his

---

[3] Delays in this misdemeanor case since Phelan was charged in November 2015 resulted from events that included a change in defense counsel in July 2019, multiple circuit court suppression hearings in 2016 and 2021, the pandemic, and a jury trial in February 2023. Briefing in this appeal was completed in April 2025.

[4] We sometimes use the shorthand phrase "DNR land" to refer to areas supervised, managed, and controlled by the DNR, as opposed to what we sometimes refer to as "non-DNR land."

emergency lights and pulled Phelan over on non-DNR land. The warden informed dispatch for the Columbia County Sheriff's Office by radio that he was making a stop for suspected littering and identified the stop location.

¶13 When the warden walked up to the driver's side window, Phelan lowered it. The warden "immediately" smelled "the odor of burnt marijuana coming from inside the cab of the truck," creating the impression that Phelan had recently "been smoking [marijuana] inside the cab." The warden asked Phelan to produce a fishing license and identification. Phelan's eyes were bloodshot and glassy. In addition, Phelan's speech was slurred and "a little slow." The warden asked Phelan if he had discarded a can back at the fishing area. Phelan denied doing so.[5]

¶14 Based on Phelan's repeated errant driving, the smell of burnt marijuana emanating from the pickup cab, Phelan's bloodshot and glassy eyes, and his slurred and somewhat slow speech, the warden's attention shifted from investigating littering to an attempt to determine whether Phelan drove while impaired.

¶15 We pause the factual narrative to note that the evidence that we describe in the next two paragraphs—the evidence that the warden obtained during a solo investigation of impairment—is the evidence that we conclude must be suppressed for reasons explained below. We will sometimes refer to this collectively as "the solo-investigation evidence." The warden acted alone both

---

[5] After Phelan's eventual arrest by sheriff's deputies who were summoned by the warden, the warden decided that Phelan had not littered, based in part on the warden's later return to, and inspection of, the spot near the Lake Wisconsin bridge where the warden initially thought Phelan discarded a can.

before and after he asked Phelan to get out of the pickup and until the deputies arrived on the scene, but we use this phrase to refer to the investigation of impairment that the warden conducted by himself after he asked Phelan to get out of the pickup.

¶16 Returning to the narrative, the warden asked Phelan to get out of the pickup so that the warden could subject him to field sobriety tests (FSTs). Phelan agreed to take the horizontal-gaze-nystagmus test, the walk-and-turn test, and the one-leg-stand test. According to the warden's assessments, Phelan displayed multiple indicators of impairment in each test. The warden acknowledged in his testimony that the horizontal gaze nystagmus test is not designed to detect marijuana use, but the other two tests assess balance and coordination, which he suggested might correlate to marijuana use. The warden used the FSTs in an effort to detect general impairment of Phelan's ability to operate a vehicle, not to detect which specific substance or substances might have caused impairment. After subjecting Phelan to the FSTs, the warden subjected him to a preliminary breath test (PBT), which did not register a significant amount of alcohol.

¶17 Phelan initially denied recent marijuana use. Later, after the warden administered the FSTs and the PBT, the warden asked Phelan whether he believed that, if a drug-sniffing dog were brought to his pickup, the dog would alert to the presence of drugs. Phelan responded that there was marijuana in the pickup and that he had ingested marijuana earlier that day.

¶18 Suspecting that Phelan was "likely impaired" by one or more substances other than alcohol, the warden contacted the sheriff's office to request "a back up" and a deputy trained as a drug recognition expert. The sheriff's office

asked the warden to "continue with Mr. Phelan" and indicated that a deputy would be sent to the location of the stop.

*Testimony by Deputies*

¶19    Wesley Austin-Nash testified that he was working as a Columbia County deputy sheriff when he was dispatched to the location where the warden had stopped Phelan's pickup, arriving at about 10:26 p.m.  Austin-Nash was dispatched based on training that he had received to become a drug recognition expert.  The warden explained to Austin-Nash that the warden suspected that Phelan was impaired but not based on alcohol consumption.  The two agreed that Austin-Nash would conduct one type of drug recognition test.  In performing that test, Phelan showed signs of impairment, although Austin-Nash was not sure of the source of impairment.  Based on Austin-Nash's observations, he asked Phelan about his recent marijuana use.  Phelan told Austin-Nash that he had smoked marijuana about four hours earlier with friends.

¶20    A second deputy, Mark Smit, testified that dispatch informed him that the warden "was requesting assistance because [the warden] believed he was out with an intoxicated driver."  When Smit got to the scene of the stop, at about 10:27 p.m., Austin-Nash was conducting the drug recognition test.  Smit placed Phelan under arrest at around 10:34 p.m.

*Additional Evidence*

¶21    At trial, the parties stipulated that the following events occurred after Smit arrested Phelan:

> On October 14, 2015, … Smit asked Mr. Phelan if he would consent to an evidentiary chemical test of his blood. Mr. Phelan granted his consent.  Detective Sergeant Smit

> then drove Mr. Phelan to Aspirus Divine Savior Hospital, where Mr. Phelan provided samples of his blood.… Smit mailed the blood samples to the State of Wisconsin Laboratory of Hygiene, which received the samples on October 15, 2015.

¶22 Also at trial, a forensic analyst supervisor with the Wisconsin State Laboratory of Hygiene testified to the following. The blood specimen collected from Phelan was analyzed at the hygiene lab. The testing revealed no ethanol, but it revealed the presence of Delta 9 THC (a restricted controlled substance that is one of the main active ingredients in marijuana) and two byproducts of the metabolization of Delta 9 THC.

*Suppression Motion and Hearing*

¶23 As pertinent to this appeal, Phelan moved for suppression on the grounds that the warden lacked statutory authority to detain or arrest Phelan and was prohibited from investigating him after the warden shifted from investigating suspected littering to investigating suspected impaired driving. The prosecutor argued in pertinent part that the warden had probable cause to arrest Phelan as soon as the warden smelled the odor of burnt marijuana and that the warden properly exercised his statutory authority to detain Phelan and investigate throughout the encounter. As part of this argument, the prosecutor contended that it would be absurd to interpret WIS. STAT. § 29.921(5) in particular to allow wardens to make arrests for crimes committed in their presence but to prohibit them from investigating those same crimes. The circuit court denied the motion.

9

*Trial*

¶24    The State proceeded on three charges at trial: operating while intoxicated as a third offense; operating with a restricted controlled substance in the blood as a third offense; and possession of drug paraphernalia.[6]

¶25    The jury found Phelan not guilty of one offense, operating a motor vehicle while under the influence of a controlled substance, and guilty of two offenses: operating with a detectable amount of restricted controlled substance (THC) in his blood as a third offense, in violation of WIS. STAT. §§ 346.63(1)(am), 340.01(50m)(e), and 346.65(2)(am)3.; and possession of drug paraphernalia, in violation of WIS. STAT. § 961.573(1).

## DISCUSSION

¶26    Phelan challenges the circuit court's denial of his suppression motion based on the court's interpretations of provisions in WIS. STAT. § 29.921, but Phelan does not dispute the version of the facts relied on by the court. An appeal from a circuit court decision whether to suppress evidence based on undisputed facts presents an issue of law that we determine de novo, independently of the circuit court. *State v. Popenhagen*, 2008 WI 55, ¶31, 309 Wis. 2d 601, 749 N.W.2d 611. We also review de novo the interpretation of § 29.921 and related statutes and the application of these statutes to undisputed facts. *See Popenhagen*, 309 Wis. 2d 601, ¶32.

---

[6] Phelan stipulated that, if the jury found him guilty of a crime, he would not contest a conviction on an additional charge of misdemeanor bail jumping. After the trial, the circuit court entered a conviction for bail jumping. The prosecution initially charged, but elected not to pursue, THC possession as a second offense.

¶27 We interpret a statute "to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*, ¶45.

¶28 We begin with the context and terms of WIS. STAT. § 29.921. Chapter 29 is devoted to "Wild Animals and Plants," and § 29.921 is found in chapter 29's "Enforcement" subchapter. In seven subsections, § 29.921 defines in detail the types of enforcement authority that DNR conservation wardens may exercise or that they are prohibited from exercising. Two subsections address arrest powers of wardens: subsection (1) addresses the general arrest powers of all wardens, and subsection (5) addresses additional arrest powers of certified wardens.

¶29 Our primary topic is subsection (5) of WIS. STAT. § 29.921. This is because Phelan does not dispute that the warden was authorized to stop his pickup under subsection (1), and to investigate suspected littering under WIS. STAT. § 29.924(1). But we summarize subsection (1) because it provided the basis for the initial stop and gives context to the meaning of subsection (5).

## I. Warden's Authorization Under Subsection (1) to Stop Phelan and Investigate Suspected Littering

¶30 Subsection (1) of WIS. STAT. § 29.921 sets forth the general arrest powers of all wardens when acting anywhere in the state. Subsection (1) is oriented around eight enumerated law violations or sets of law violations, including both forfeitures and crimes. These enumerated violations that all

11

wardens may enforce anywhere in the state are generally related in some way to conservation or the handling of firearms:

> (1) GENERALLY. The [DNR] and its wardens may execute and serve warrants and processes issued under any law enumerated in [WIS. STAT. §§] 23.50(1), 167.31, 346.19, 940.24, 941.20, 948.60, 948.605 and 948.61 in the same manner as any constable may serve and execute the process; and may arrest, with or without a warrant, any person detected in the actual violation, or whom the officer has probable cause to believe is guilty of a violation of any of the laws cited in this subsection, whether the violation is punishable by criminal penalties or by forfeiture, and may take the person before any court in the county where the offense was committed and make a proper complaint. For the purpose of enforcing any of the laws cited in this subsection, any officer may stop and board any boat and stop any vehicle, if the officer reasonably suspects there is a violation of those sections.

§ 29.921(1).

¶31 Pertinent to this case, WIS. STAT. § 29.921(1) identifies WIS. STAT. § 23.50(1) as one authorized basis for the specific warden enforcement activities that are described in § 29.921(1). Section 23.50(1) in turn lists conservation-related forfeitures that include WIS. STAT. § 287.81. The littering forfeiture is found at § 287.81(2)(a).[7]

¶32 For context, we note that WIS. STAT. § 29.921(1) enumerates many bases, other than suspected littering, for the law enforcement activities described in subsection (1). For example, § 29.921(1) cross references WIS. STAT. § 23.50(1), which itself incorporates by reference the entirety of the extensive

---

[7] Wisconsin conservation wardens have had the authority to pursue littering offenses any place in the state since 1959, when the legislature first added the then-current version of the littering statutes to the violations to the general law enforcement authority of conservation wardens. *See* WIS. STAT. §§ 29.05(1), 346.94(6), (6m) (1959-60).

"Conservation" chapter of the statutes, WIS. STAT. ch. 23. Within chapter 23, many areas of potential enforcement are identified for "enforcing officers" or "officers," *see, e.g.*, WIS. STAT. § 23.62(1) (describing the steps that "an enforcing officer" may take when the officer has probable cause to believe that a person has violated identified statutes or rules), and this includes DNR conservation wardens, *see* WIS. STAT. § 23.51(3) (defining "enforcing officer"). In addition, § 29.921(1) enumerates a limited number of statutes that have criminal penalties, such as endangering safety by use of a dangerous weapon in violation of WIS. STAT. § 941.20.

¶33 Significantly, WIS. STAT. § 29.921(1) must be construed in light of WIS. STAT. § 29.924(1). There, the legislature has specified that "wardens shall, upon receiving notice or information of the violation of any laws cited in [§] 29.921(1), as soon as possible make a thorough investigation and institute proceedings if the evidence warrants it." § 29.924(1). Thus, wardens have expansive investigative authority when pursuing potential violations of statutes and rules specified in § 29.921(1), which as discussed below contrasts sharply with the general prohibition on the investigation of crimes contained in § 29.921(5).

¶34 Turning back to the specifics here, the State contends and Phelan agrees that the warden had authority to stop Phelan's pickup and investigate him on suspicion of littering under subsection (1). This is because, as summarized above, the warden suspected that Phelan littered, littering is an offense that wardens are authorized to enforce, and the warden was authorized to investigate suspected littering under WIS. STAT. § 29.924(1). The suspected littering occurred on non-DNR land and the warden stopped Phelan's pickup on non-DNR land, but

13

WIS. STAT. § 29.921(1) does not contain any pertinent geographic limitations on warden enforcement authorities.[8]

¶35    Further, although neither party calls our attention to it, WIS. STAT. § 23.58(1) provided additional authority for the warden here, given his suspicion of littering, to stop Phelan "for a reasonable period of time" and to "demand" Phelan's name and address "and an explanation of" his conduct.[9]  This leaves the parties in agreement, correctly for reasons that we have explained, that WIS. STAT. § 29.921(1) provided authority for the warden, as part of his littering investigation, to obtain all of the evidence gained before the warden asked Phelan to get out of the pickup.

¶36    But while WIS. STAT. § 29.921(1) lists many crimes and forfeitures, including littering, no form of impaired driving or possession of controlled

---

[8] This is not to say that conservation warden arrest powers are never delineated in part by geographic location—some are, both pursuant to WIS. STAT. § 29.921 and other statutes. *See, e.g.*, § 29.921(5) (referring to WIS. STAT. § 23.11(4), which grants wardens arrest powers on DNR lands); WIS. STAT. § 27.01(13) (providing in part that "duly appointed wardens may arrest, with or without warrant, any person within [a state park], committing an offense against the laws of the state or in violation of any rule or regulation of the department in force in such state park").

[9] WISCONSIN STAT. § 23.58(1), like WIS. STAT. § 29.921(1), creates authority based in part on violations specified in WIS. STAT. § 23.50(1) (which includes littering), stating in pertinent part:

> After having identified himself or herself as an enforcing officer, an enforcing officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a violation of those statutes enumerated in [§] 23.50(1) ….  Such a stop may be made only where the enforcing officer has proper authority to make an arrest for such a violation.  The officer may demand the name and address of the person and an explanation of the person's conduct.  Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

substances is included in the enumerated law violations. Further, the State essentially conceded at oral argument on appeal that the warden's authority to conduct a littering investigation ended no later than when the warden asked Phelan to get out of the pickup to perform the tests and began collecting the solo-investigation evidence.

¶37 There is no dispute that the warden did not purport to arrest Phelan at any time, nor is there any suggestion that the warden's actions could reasonably be interpreted as effectuating an arrest. Instead, the warden temporarily detained Phelan before the arrival of the deputies, who took over the investigation.

¶38 Phelan contends that the warden lacked authority to detain him before the deputies arrived on the scene, based on probable cause that Phelan committed a law violation other than littering. "[T]he detainment of Mr. Phelan became unlawful" after the suspected littering investigation ended, he contends, because "there was no[] probable cause to arrest" him. This calls for discussion of the arrest powers of certified wardens that are defined in WIS. STAT. § 29.921(5), including our conclusion about the authority of the certified warden to detain Phelan. We conclude that, by the time the warden asked Phelan to get out of the pickup, the warden had authority to arrest Phelan for possession of marijuana under subsection (5) and accordingly the authority to detain him pending the arrival of the deputies. In a separate subsection below, we will explain our conclusion that the warden was prohibited from collecting the solo-investigation evidence under subsection (5) after asking Phelan to get out of the pickup.

## II. Warden's Authorization to Arrest Phelan Under Subsection (5)

¶39 WISCONSIN STAT. § 29.921(5) authorizes certified wardens to "arrest a person who has committed a crime in the presence of the warden." We conclude

that the warden here was authorized under subsection (5) to arrest or detain Phelan based on personally witnessing the following before the warden asked Phelan to get out of the pickup: Phelan's repeated errant driving; the smell of burnt marijuana emanating from the pickup cab; Phelan's bloodshot and glassy eyes; and his slurred and somewhat slow speech. These observations objectively established to the level of probable cause that Phelan possessed marijuana, in violation of WIS. STAT. § 961.41(3g)(e), while Phelan was in the presence of the warden.

¶40 Summarizing, subsection (5) of WIS. STAT. § 29.921 authorizes specific grounds for arrests by certified wardens, along with related responsibilities. One responsibility is to refrain from "investigations for violations of state law," aside from three specified contexts. Subsection (5) states in pertinent part:

> (5) ADDITIONAL ARREST POWERS. In addition to the arrest powers under sub. (1), a warden who has completed a program of law enforcement training approved by the law enforcement standards board, has been certified as qualified to be a law enforcement officer under [WIS. STAT. §] 165.85(4)(a)1. and has complied with any applicable requirements under [§] 165.85(4)(a)7. while on duty and in uniform or on duty and upon display of proper credentials may assist another law enforcement agency as defined under [§] 165.85(2)(bv) including making an arrest at the request of the agency, may arrest a person pursuant to an arrest warrant concerning the commission of a felony or may arrest a person who has committed a crime in the presence of the warden. If the warden makes an arrest without the presence of another law enforcement agency, the warden shall cause the person arrested to be delivered to the chief of police or sheriff in the jurisdiction where the arrest is made, along with the documents and reports pertaining to the arrest. The warden shall be available as a witness for the state. A warden may not conduct investigations for violations of state law except as authorized in [WIS. STAT. §§] 23.11(4), 29.924(1) and 41.41(12).

16

¶41    To repeat, there is no dispute here that, at the time of the incident, the warden was properly certified under the terms of WIS. STAT. § 29.921(5). Further, there is no dispute that he was on duty and that he either properly displayed his credentials to Phelan or was in uniform.

¶42    Under such circumstances, subsection (5) of WIS. STAT. § 29.921 adds the following three arrest powers for certified wardens to the general warden arrest powers defined in its subsection (1), with the third being our primary focus:

- Authority to "assist another law enforcement agency"—meaning any state or local governmental unit "that employs one or more law enforcement officers," pursuant to WIS. STAT. § 165.85(2)(bv)—"including making an arrest at the request of the agency."

- Authority to "arrest a person pursuant to an arrest warrant concerning the commission of a felony."

- Authority to "arrest a person who has committed a crime in the presence of the warden."

¶43    This raises the issue of what "committed a crime in the presence of the warden" means. For reasons we now explain, we interpret this phrase to mean that a certified warden is authorized to make an arrest if that warden has personally witnessed—based on any combination of the warden's contemporaneous sensory perceptions, but based only on those contemporaneous perceptions—facts that objectively support probable cause to believe that the person has committed a crime, and not merely a civil law violation, in the warden's presence. We now break down three components of our interpretation before applying it to the facts here: a personal-witness requirement; an objective standard; and a required level of suspicion reaching probable cause.

*The Personal-Witness Requirement*

¶44    Regarding the need for the arresting warden to have personally witnessed all relevant facts of a criminal offense through the warden's reliance on the warden's own senses, we think this is the only reasonable construction of the phrase "in the presence of the warden."  "The warden" being referred to must be the arresting warden, not any other warden or wardens.  Further, the phrase "in the presence of" does not permit an interpretation that relevant facts supporting suspicion of a crime may be derived from any source other than the warden's own senses of contemporaneous facts.

¶45    In this context, the phrase "in the presence of the warden" stands in stark contrast both to analogous provisions in WIS. STAT. § 29.921 and to the general arrest authority given to local law enforcement officers, which both allow officers to rely on many sources of information.  *See, e.g.*, § 29.921(1) ("whom the officer has probable cause to believe is guilty of a violation of any of the laws cited in this subsection," presumably based on any reliable source of information); WIS. STAT. § 968.07(1)(d) (A law enforcement officer may arrest a person when "[t]here are reasonable grounds to believe that the person is committing or has committed a crime," again presumably based on any reliable source of information).[10]

---

[10] We generally use the phrase "local law enforcement" as shorthand to refer to all law enforcement officers, other than DNR wardens, who have authority to make an arrest for a crime while acting within the officer's statutory authority, including sheriff's deputies and police officers.  *See* WIS. STAT. § 967.02(5) (defining "law enforcement officer" in a manner that includes DNR wardens for some purposes); *see also* WIS. STAT. § 29.921(1) (using the phrase "in the same manner as any constable"); note 15, *infra*.

¶46    By its unambiguous terms, the in-the-presence requirement, including the phrase "who has committed a crime," excludes many hypothetical scenarios in which a certified warden might have witnessed events—perhaps amounting to strong evidence—that a crime has *already been* committed outside the presence of the warden or that a crime *might yet be* committed. The facts must be contemporaneously witnessed by the arresting warden.

*The Objective Standard*

¶47    The certified warden testified that his subjective purpose in asking Phelan to get out of the pickup was to determine whether Phelan had driven while impaired, based on what the warden had observed up to that point. The warden made no reference to a suspicion that Phelan possessed THC. But we conclude that the warden's subjective suspicions do not matter, because a certified warden has authority to arrest a person whenever the elements of a crime were objectively discernable through the arresting warden's senses to the requisite level of suspicion, whether or not the warden subjectively identified that crime.

¶48    Phelan conceded at oral argument that the test is objective and not subjective. Further, the text of WIS. STAT. § 29.921(5) refers only to the seemingly objective fact of "a person who has committed a crime in the presence of the warden."

¶49    Beyond that, we see no reason to think that the legislature has decided in this context to use a different standard from the one that is familiar from the Fourth Amendment context. *See **State v. Kramer***, 2009 WI 14, ¶¶27, 36 & n.9, 315 Wis. 2d 414, 759 N.W.2d 598 (explaining U.S. Supreme Court precedent stating that, when a police officer's conduct is supported by an objectively ascertainable basis to establish probable cause or reasonable suspicion

under the Fourth Amendment, that conduct meets the Fourth Amendment's reasonableness requirement and the officer's subjective views or motivations are irrelevant); *see also **Whren v. United States***, 517 U.S. 806, 816-19 (1996) (stating that a vehicle stop based on probable cause that a traffic violation occurred complies with the Fourth Amendment, regardless of police motives).  Under this objective standard, what matters is how the facts witnessed by the warden would be assessed by a reasonable warden, in light of the warden's training and experience, regarding the possible commission of a crime.  *See **State v. Post***, 2007 WI 60, 301 Wis. 2d 1, ¶13, 733 N.W.2d 634 (addressing objective standard under the Fourth Amendment in the context of an officer's reasonable suspicion of criminal activity).

### *The Probable Cause Level of Suspicion*

¶50    The arrest-in-the-presence portion of WIS. STAT. § 29.921(5) does not explicitly state a level of suspicion.  We conclude for multiple reasons that the legislature intended to apply the probable cause standard that is familiar from the Fourth Amendment context, although, for reasons we have just explained, that standard is modified to account for the personal-witness requirement.  That is, while the Fourth Amendment version "'requires an examination of the totality of the circumstances,'" ***State v. Moore***, 2023 WI 50, ¶8, 408 Wis. 2d 16, 991 N.W.2d 412 (quoted sourced omitted), the test here is narrower, requiring consideration of only those facts that have been witnessed by the warden and that occurred in the warden's presence.

¶51    The State does not argue that a level of suspicion lower than the modified probable cause standard applies.  Instead, the State commends probable cause to us as the level of suspicion with which certified wardens would be most

familiar, from the Fourth Amendment context, and contends that wardens would readily understand how to apply this standard in performing their duties. The State also questions whether there is any level of suspicion recognized in Wisconsin law other than probable cause that could apply in this context.

¶52    In further support, the State points out that our supreme court in *Mantei v. State*, 210 Wis. 1, 5, 245 N.W. 683 (1932), referred to the level of suspicion required for a police officer to make a warrantless felony arrest committed in the officer's presence to be whether the officer has "probable cause to believe that the defendant has committed, or is about to commit, a felony." *Mantei* is distinguishable in some respects from the context here. But we consider this statement to be an additional basis to conclude that the legislature set the suspicion bar at the level of probable cause. *See State v. Grady*, 2006 WI App 188, ¶9, 296 Wis. 2d 295, 722 N.W.2d 760 ("We presume that the legislature acts with full knowledge of existing case law when it enacts a statute.").

¶53    Phelan argues that the legislature set the level of suspicion in this context at "something greater than 50 percent" likelihood, although he does not purport to define "something greater." His argument proceeds as follows. Elsewhere in WIS. STAT. § 29.921, the legislature in places uses the familiar phrase "probable cause," which Phelan contends essentially matches the familiar meaning in the Fourth Amendment context. *See* § 29.921(1), (4). And Phelan further points out that the Fourth Amendment probable cause standard does not require proof "'that guilt is more likely than not,'" *see Moore*, 408 Wis. 2d 16, ¶8 (quoted source omitted). But in contrast, he notes, the phrase "probable cause" is missing from the arrest-in-the-presence provision in § 29.921(5). Therefore, Phelan contends, the legislature must have intended to require a higher level of suspicion, something above 50 percent likelihood.

21

¶54    One problem with Phelan's argument is he does not provide concrete authority for his indefinite "something greater than 50 percent" position.  In sharp contrast, the legislature could easily have envisioned certified wardens understanding and applying the probable cause standard.

¶55    Beyond that point, we discern a logic to the wording in WIS. STAT. § 29.921(5) that could explain the use of the phrase "probable cause" in other § 29.921 provisions and its absence from the arrest-in-the-presence portion of § 29.921(5)—a logic that is consistent with construing this to be the familiar probable cause standard.  The legislature elected to use the following long and somewhat intricate sentence, ending with the phrase now at issue:

> In addition to the arrest powers under sub. (1), a warden who has completed a program of law enforcement training approved by the law enforcement standards board, has been certified as qualified to be a law enforcement officer under [WIS. STAT. §] 165.85(4)(a)1. and has complied with any applicable requirements under [§] 165.85(4)(a)7. while on duty and in uniform or on duty and upon display of proper credentials may assist another law enforcement agency as defined under [§] 165.85(2)(bv) including making an arrest at the request of the agency, may arrest a person pursuant to an arrest warrant concerning the commission of a felony *or may arrest a person who has committed a crime in the presence of the warden.*

§ 29.921(5) (emphasis added).  The legislature explicitly conveyed two core points in the ending phrase, leaving as merely implied the degree of certainty that a warden must have.  The first core point is the personal-witness requirement discussed above.  The second core point is that the witnessed conduct must be a crime—as opposed to another law violations or perceived misbehavior.  Neither of these two core points purports to establish an unfamiliar level of suspicion needed to justify a warrantless arrest.  If one were redrafting the long sentence to

explicitly address the level of suspicion, there could be ways to insert into the final phrase wording such as "to the level of probable cause." But, given the structure of the sentence and the two core points that the legislature sought to establish, the fact that such alternative drafting did not occur does not appear to signal an intent to create an alternative to probable cause.

*Application to the Facts Here Under **Secrist** and **Moore***

¶56 Applying the standards we have just explained, we conclude that the warden here was authorized under WIS. STAT. § 29.921(5) to arrest Phelan at the time that the warden asked Phelan to get out of the pickup because probable cause objectively existed at that point that Phelan possessed marijuana in the presence of the warden based on information available to the warden through his senses.[11]

¶57 The undisputed facts here easily satisfy the probable cause standard under the reasoning in *State v. Secrist*, 224 Wis. 2d 201, 589 N.W.2d 387 (1999), reaffirmed in *Moore*, 408 Wis. 2d 16. In each case, our supreme court determined that there was probable cause to make an arrest for possession of marijuana based on odor. *Secrist*, 224 Wis. 2d at 204 ("[T]he odor of a controlled substance provides probable cause to arrest when the odor is unmistakable and may be

---

[11] We need not address other possible crimes, on the facts here, that might have triggered the crime-in-the-presence authority of WIS. STAT. § 29.921(5), but we note several that the State could not evoke on these facts. There was no evidence to support an argument that the warden observed Phelan driving so dangerously that it could have risen to the level of a suspected crime. *See, e.g.*, WIS. STAT. § 941.30(2) (second-degree recklessly endangering safety). Nor could the State argue that the prosecution established a factual record that the warden was aware at the time he stopped and encountered Phelan that Phelan had prior convictions which would have transformed the civil forfeiture of first-time operating with a detectable amount of restricted controlled substance (THC) in his blood, in violation of WIS. STAT. §§ 346.63(1am), 340.01(50m)(e), and 346.65(2)(am)1., into a third-time violation, under § 346.65(2)(am)3. and hence a crime as opposed to a forfeiture.

linked to a specific person or persons because of the circumstances in which the odor is discovered or because other evidence links the odor to the person or persons."); *see also* **Moore**, 408 Wis. 2d 16, ¶¶11-12 (police officers' credible testimony regarding overwhelming smell of marijuana was sufficiently linked to the defendant to satisfy the probable cause standard to arrest). Like the officers in **Secrist** and in **Moore**, the warden here smelled the distinct odor of marijuana emanating from the car that Phelan, the sole occupant, had been driving. The following added to the probability that Phelan possessed marijuana in the presence of the warden: the repeated errant driving, the bloodshot and glassy eyes, and the slurred and somewhat slow speech.

¶58　　At oral argument, Phelan contended that the warden's perception of the smell of burnt marijuana is "weaker" than the analogous facts in **Secrist** and **Moore**. His argument is that this is because there is no evidence that the warden had the training or the "knowledge specific to marijuana or the impact or impairment or anything related to that," and because **Secrist** and **Moore** are premised on detection abilities of police officers who have "some experience either identifying marijuana and/or its impact." It is true that our supreme court in **Secrist** noted that the officer in that case was "a trained veteran of the New Berlin police department with 23 years [of] experience." **Secrist**, 224 Wis. 2d at 219. But, at the time of the stop here, the warden had been continuously certified over his 15 years as a warden. Further, the warden gave unambiguous, consistent testimony, credited by the circuit court, that he "immediately" perceived a "smok[]y smell" of marijuana coming from the cab of the pickup. The issue is not whether the warden was an expert in the identification of marijuana smells or the typical effects of marijuana use, but instead whether he could reasonably conclude in the moment that he was smelling burnt marijuana and that this smell was

sufficiently linked to Phelan and no one else—putting aside the additional facts, beyond smell, that supported the suspicion of marijuana possession.

¶59   For these reasons, for purposes of clarifying the meaning of WIS. STAT. § 29.921(5) and addressing Phelan's argument to the contrary, we conclude that, at the point when the warden asked Phelan to get out of the pickup, there was probable cause that Phelan possessed marijuana and that this created authority for the warden to arrest him under § 29.921(5).  Even though no party contends that the warden did place Phelan under arrest at that point, the warden's authority to make an arrest supported the warden's detention of Phelan from that point until the deputies arrived on the scene.[12]

### III.  The Prohibited Investigation Under Subsection (5)

¶60   We conclude that, while the certified warden was authorized to temporarily detain Phelan based on the existence of probable cause that Phelan possessed marijuana, the certified warden was not authorized under WIS. STAT. § 29.921(5) to conduct the solo investigation of suspected impaired driving.  As noted above, this is the investigation that resulted in the FSTs, the PBT, and the incriminating statements that Phelan made to the warden, after Phelan stepped out of the pickup and before the deputies arrived on the scene.[13]  At the same time, however, we also conclude that there is no basis to suppress any of the evidence

---

[12] Phelan does not develop an argument that additional evidence must be suppressed because, having detained him, the warden failed in his responsibility to effectuate an arrest and to cause Phelan to be delivered to the local chief of police or sheriff.  *See* WIS. STAT. § 29.921(5).

[13] Given this conclusion, we need not resolve a dispute between the parties about whether the warden's administration of FSTs was deficient.

that the deputies obtained after they arrived on the scene, including when the warden was assisting them.

*Prohibited Investigation*

¶61    The prohibition on investigations in WIS. STAT. § 29.921(5) states, in its entirety: "A warden may not conduct investigations for violations of state law except as authorized in [WIS. STAT. §§] 23.11(4), 29.924(1) and 41.41(12)."  We now explain why we conclude that some of the warden's actions here were prohibited, given the evident legislative intent of § 29.921(5).  The legislature signaled an intent to tightly circumscribe the investigatory activities of certified wardens when they are not operating on DNR land or taking actions related to specific tasks assigned to the DNR as specified in §§ 23.11(4), 29.924(1), and 41.41(12).

¶62    Only one of these three statutory exceptions to the investigation prohibition applies to the facts here, the exception based on WIS. STAT. § 29.924(1).  As we now explain, this exception applies to only the first phase of the warden's activities, the littering investigation.[14]  Section 29.924(1), already quoted above, directs wardens to investigate violations referred to in WIS. STAT. § 29.921(1): a warden "shall, upon receiving notice or information of the violation

---

[14] There is no dispute that the other two exceptions to the WIS. STAT. § 29.921(5) investigation prohibition could not apply on these facts.  The first exception, WIS. STAT. § 23.11(4), involves the authority that wardens may exercise on DNR lands, and neither the suspected littering nor the stop occurred on DNR land.  The third exception, WIS. STAT. § 41.41(12), is based on a specific publicly protected property located in the state's driftless region, the Kickapoo Valley Reserve, and there is no suggestion that this case had anything to do with the reserve or rules created by the Kickapoo Reserve Management Board.  We observe that if the stop in this case had occurred on DNR land, then the prohibition on investigation for any crime committed in the warden's presence, such as possession of THC, would not have applied. *See* §§ 29.921(1), 29.924(1).

26

of any laws cited in [§] 29.921(1), as soon as possible make a thorough investigation and institute proceedings if the evidence warrants it." § 29.924(1). Here, this exception to the subsection (5) prohibition applies to the warden's activities only while he investigated the littering suspicion, which is one type of violation that may be investigated expansively pursuant to § 29.924(1), but the exception did not apply after he shifted to investigate impaired driving.

¶63 Guiding our analysis here is a critical interplay among WIS. STAT. §§ 29.921(1), 29.921(5), and 29.924(1). All of the specific, enumerated, conservation-related law violations that all wardens may enforce under § 29.921(1) shall be thoroughly investigated by wardens, which stands in stark contrast to the direction in § 29.921(5) that certified wardens are prohibited from conducting investigations of all other violations of state law except in well-defined circumstances.

¶64 Two hypotheticals may illustrate the point. If a conservation warden has probable cause to believe that a person is guilty of, for example, timber theft in violation of WIS. STAT. § 26.05, then the warden is to "as soon as possible make a thorough investigation and institute proceedings if the evidence warrants it." *See* WIS. STAT. §§ 29.924(1), 29.921(1), 23.50(1) (enumerating "violations of [WIS. STAT. ch.] 26"). In contrast, even a certified warden may not investigate an intentional homicide that does not occur under circumstances that fit into one of the three exceptions in subsection (5)—no matter how incriminating the facts are that the warden witnessed or that the warden was otherwise aware of. Instead, if the homicide occurred in the warden's presence, the warden may make an arrest and cause the person to be delivered to a local police or sheriff's department. And, regardless of whether the homicide occurred in the warden's presence, the

warden may in any case assist and provide relevant information and evidence to local law enforcement.  *See* § 29.921(5).

¶65    Returning to the facts here, there is not an exception to the WIS. STAT. § 29.921(5) investigation prohibition that applies to save from potential suppression the evidence that the warden obtained through his solo investigation of impaired driving.  Applying a plain language interpretation to the terms of § 29.921(5)—including as construed in light of § 29.921(1) and WIS. STAT. § 29.924(1)—we conclude that the warden conducted a prohibited investigation of suspected impairment.

¶66    The State suggests that the warden here could rely on the general authority provided in WIS. STAT. § 968.24 that permits all "law enforcement officer[s]" to temporarily stop people in public places on reasonable suspicion of a crime and "demand the name and address of the person and an explanation of the person's conduct."[15]    The State's suggestion is that, under the authority of § 968.24, the warden here was permitted to ask Phelan for an explanation of the

---

[15]  WISCONSIN STAT. § 968.24 provides in its entirety:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct.  Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

As indicated *supra* at note 10, the warden here was, for some purposes, a "law enforcement officer" as defined in WIS. STAT. § 967.02(5), which states in pertinent part that this means "any person who by virtue of the person's office … is vested by law with the duty to … make arrests for crimes while acting within the scope of the person's authority."

marijuana smell. A similar argument could be made under the more specific-to-wardens statute referenced above, WIS. STAT. § 23.58(1).

¶67    We agree with Phelan that, based on the undisputed facts here, the questioning to which the warden subjected Phelan before the deputies arrived was inextricably bound up in the warden's solo investigation, which we conclude was explicitly prohibited by WIS. STAT. § 29.921(5). The specific, explicit terms of the investigation prohibition trump the general authority that WIS. STAT. § 968.24 provides to law enforcement officers in other contexts, and similarly trump the authority provided to wardens under WIS. STAT. § 23.58(1). *See State v. James*, 2005 WI App 188, ¶23, 285 Wis. 2d 783, 703 N.W.2d 727 (stating the general rule of construction that the more specific of two statutes generally prevails in the event of conflict). Expansive interpretations of §§ 968.24 or 23.58(1) in this context would nullify the unambiguous general prohibition on investigations in § 29.921(5). The State fails to develop an argument not based on § 968.24 to support the proposition that the questioning was not inextricably intertwined with the prohibited investigation.

¶68    Stepping back, WIS. STAT. § 29.921(5) sets up potential tension between, on one hand, the authorization for certified wardens under their expanded authority to arrest a person who commits a crime in the presence of the warden, and on the other hand, the general prohibition on investigating violations of state law. This raises a potentially counterintuitive prospect, namely, that a certified warden is prohibited from investigating the circumstances that justify the warden in making an authorized arrest. That is the case here.

¶69    But the prohibition on investigations of state law violations represents an unambiguous legislative decision to bar wardens, even certified

wardens, from conducting investigative activity outside specified contexts. One evident legislative purpose is to assign primary responsibility for the investigation of many criminal law violations—all crimes aside from those covered by the terms of subsection (5), which includes the crimes among the other law violations enumerated in subsection (1)—to local law enforcement. Our interpretations of provisions in WIS. STAT. § 29.921(5) are informed by the evident legislative purpose to expand in limited and well-defined ways the law enforcement authority of certified wardens, tightly circumscribing that authority when wardens are not taking actions related to specific tasks assigned to the DNR. This leaves the vast run of criminal law investigations to local law enforcement, with possible assistance from wardens, and in any case with the benefit of any observations that a warden can provide.

¶70 The State asserts that the only reasonable interpretation of WIS. STAT. § 29.921(5) is that, any time a certified warden is authorized to make an arrest, the warden is permitted to "ask[] questions to determine whether what appears to be a crime committed in the warden's presence is a crime." In a similar vein, the State contends that, if a certified warden makes a traffic stop that is authorized under subsections (1) or (5), and the warden suspects that a crime has been committed in the warden's presence, the warden is not prohibited from investigating the suspected crime, given the authority to make the stop in the first place. But the State fails to support these assertions by reference to the terms of § 29.921, and such an interpretation contradicts those terms. The State's approach would directly undermine the unambiguous rule prohibiting investigations that do not fit into one or more of the three exceptions.

¶71 Along similar lines, the State asserts that

> when there is probable cause that a crime has been committed in the warden's presence, the warden must be authorized [under WIS. STAT. § 29.921(5)] to do things like take statements at the scene, collect or secure evidence, take photos, and conduct field sobriety tests or a PBT. Those actions do not constitute initiating or conducting an investigation. They are simply standard law enforcement tasks attendant to an arrest.

Again here, the State's assertion about "standard law enforcement tasks" that "must be authorized" finds no footing in the language of § 29.921(5). It is self-evident that each of the tasks referred to by the State is a form of investigation. Indeed, the State acknowledged at oral argument on appeal that the term "investigations" as used in subsection (5) has an expansive meaning, namely, that a warden is "trying to determine if a crime has been committed, and if so, by whom." It does not help the State to note that the tasks that the warden here performed are standard law enforcement tasks. If anything, this would support the view that the legislature likely had these standard investigative procedures front of mind in creating the prohibition as part of subsection (5).

¶72 Viewed another way, the State asks us to significantly rewrite subsection (5) by qualifying what is, aside from the three exceptions, the unqualified prohibition on investigations of state law violations, which we cannot do. *See **State v. Neill***, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521 ("'It is not up to the courts to rewrite the plain words of statutes,'" but instead courts "'interpret the words the legislature actually enacted into law.'" (quoted sources omitted)).

¶73 It supports our interpretation that, under WIS. STAT. § 29.921(5), when a certified warden has exercised any of the three types of arrest powers and made "an arrest without the presence of another law enforcement agency," this triggers the following responsibilities: "the warden shall cause the person arrested

to be delivered to the chief of police or sheriff in the jurisdiction where the arrest is made, along with the documents and reports pertaining to the arrest." When construed together with the explicit prohibition on warden investigations, this contemplates that wardens are to simply document events leading up to an arrest, but that all investigations not covered by the three exceptions in § 29.921(5) will be performed by local law enforcement.

¶74 The State poses two hypothetical situations in which, according to the State, our interpretation would produce absurd results that the legislature could not have intended, because certified wardens would be prohibited from ascertaining whether a crime had occurred in the warden's presence. In the first hypothetical, a warden witnesses an apparent battery but cannot investigate to determine whether the apparent victim consented to being struck. In the second, a warden witnesses an apparent child abduction but cannot investigate to find out whether the possible abductor is a parent acting lawfully.

¶75 The State's hypotheticals, and countless others that one could imagine, could support a concern that the prohibition on investigations will sometimes place certified wardens in difficult positions, circumstances in which acting on their reasonable suspicions could risk the suppression of evidence. But that falls short of establishing that our interpretation produces absurd results. To the contrary, in each of the State's examples, the warden could make an arrest based on probable cause if the events witnessed by the warden merited it. Further, the warden could immediately alert local law enforcement to the circumstances and then provide reports and testimony of all that the warden observed for purposes of any potential enforcement action or proceeding. We also note that the State's examples illustrate ways in which the prohibition on investigations could serve feasible legislative objectives. One objective could be to prevent certified

wardens from conducting solo investigations of criminal activities, such as child abduction, that should be conducted instead by local law enforcement based on various policy considerations that are easy to envision.

¶76　In a related policy argument, the State contends that the legislature must be aware that, in some counties at certain times, it could take hours for local law enforcement to respond to a request from a warden to initiate a criminal investigation, and the legislature could not have intended to "hamstring" wardens who cannot count on prompt responses by local law enforcement. But again, the balance to be struck in delegating or prohibiting investigatory authority is for the legislature alone to make.

¶77　It does not matter how else the legislature could have weighed concerns about the best uses of scarce warden resources for DNR-related purposes, about potential conflicts between wardens and local law enforcement, about the competency or integrity of investigations conducted by wardens who are not assisting local law enforcement, or about other goals that we can envision. What matters for our analysis is that the terms of the general prohibition on investigations apply here to the warden's solo investigation of suspected impaired driving.

¶78　The State attempts to distinguish between the tasks that the warden conducted in his solo investigation of impaired driving and what the State argues would be the prohibited activity of a warden affirmatively seeking to "ferret out crime." As part of this argument, the State suggests that the word "conduct" in the phrase "may not conduct investigations" means only that a warden may not initiate investigative steps at a time when the warden lacks authority to arrest someone. To the extent that we follow these arguments, we reject them as invitations to

essentially add terms to the phrase "may not conduct investigations." The State does not identify any textual clues in WIS. STAT. § 29.921(5) or closely related statutes to support these arguments.

¶79 We also reject the State's suggestions that any conduct by a certified warden that could satisfy the Fourth Amendment must necessarily satisfy the general prohibition on investigations in WIS. STAT. § 29.921(5). Again here, the State's approach would prevent the prohibition from having any independent meaning. We have noted ways in which specific familiar Fourth Amendment concepts, such as probable cause, assist in filling in the gaps for standards that are not explicitly addressed in § 29.921. But this does not mean that all warden conduct that might pass muster under the Fourth Amendment would also pass muster under § 29.921.

*Phelan Fails to Show That the Deputies Violated*
*WIS. STAT. § 29.921(5) in Obtaining Evidence*

¶80 Turning to the evidence obtained after the deputies arrived on the scene in response to the warden's eventual call, Phelan fails to develop a supported argument that any of that evidence was obtained in violation of the prohibition on investigations of state law violations by wardens in WIS. STAT. § 29.921(5).

¶81 For example, Phelan does not argue that, after the deputies arrived on the scene, the warden himself, to the extent that he helped advance the deputies' investigation, was not "assist[ing] another law enforcement agency."

*See* WIS. STAT. § 29.921(5).[16]    This includes the aspect of the deputies'
investigation during which Deputy Austin-Nash and the warden apparently jointly
searched the pickup.    We see no basis for an argument that the warden's
involvement in that search is a basis to suppress the evidence obtained in the
search.

¶82    Similarly, regarding Deputy Austin-Nash's testimony that he
conducted a drug recognition test and that Phelan told him that Phelan had smoked
marijuana earlier, Phelan does not support an argument that these events were
products of the warden's solo investigation and not products of the deputies'
investigation, merely assisted by the warden.    The warden was able to relay
information to the deputies that, as we have explained, the warden had been
authorized to obtain under WIS. STAT. §§ 29.921(1) and 29.924(1), including the
smell of burnt marijuana from Phelan's truck and his bloodshot and glassy eyes.
Phelan does not argue that this evidence obtained before the warden's solo
investigation was insufficient to justify the deputies' investigations after they
arrived on the scene, even when one subtracts evidence obtained by the warden
during his solo investigation of impaired driving.    As referenced above,
§ 29.921(5), including its investigation prohibition, contemplates that local law
enforcement may elect to investigate a suspected crime if alerted to it by a

---

[16] At one point, the warden testified that he "believe[d]" that he had informed the
Columbia County Sheriff's Office of the following: that the warden smelled marijuana at the
window of Phelan's pickup and that the warden "believed" that the encounter was "going to be
more than a stop" for littering, going "beyond the littering investigation."  But the warden did not
purport to establish the timing of this communication, nor did he expand on what he might have
conveyed regarding the concept of going "beyond" littering or what response he might have
received.  The warden testified that he could not "recall the exact transmission," including
whether he "ask[ed] for help" from the sheriff's office.  For these reasons, we ignore this
particular testimony.

certified warden, and that is what eventually occurred here. Phelan does not persuade us that § 29.921(5) prohibited the deputies from engaging in this type of investigation once they were on the scene.

¶83 As for the blood test results, the parties stipulated at trial that a deputy obtained Phelan's consent to obtain samples of his blood for purposes of chemical tests, the samples were collected, and they were transferred to the state laboratory for testing—none of which were accomplished by the warden. Phelan does not identify a viable basis to conclude that the blood test was obtained in violation of WIS. STAT. § 29.921(5). At oral argument, Phelan contended that it would be "speculating completely" to predict whether, if the warden had not conducted the prohibited solo investigation of impairment, Phelan "would have consented to the blood draw" or, if he had not consented, that "the State would have gone and gotten a warrant for his blood." But Phelan's motion to suppress, as he pursued it in the circuit court and continues to present arguments in this appeal, is entirely premised on purported violations of § 29.921(5), and subsection (5) has nothing to say about the activities of the deputies on these facts.

## IV. Remedy for Violation of Subsection (5) Investigation Prohibition

¶84 Both parties assume, without providing authority or analysis, that Phelan is entitled to suppression of evidence that was obtained in violation of WIS. STAT. § 29.921(5), even though suppression is not explicitly identified in subsection (5) or elsewhere as a remedy for a violation of the prohibition on investigations. We now explain why we conclude that the suppression remedy is appropriate here for the solo-investigation evidence. This calls for application of the reasoning in *Popenhagen*, which establishes that in some circumstances

36

evidence suppression is an appropriate remedy for noncompliance with a statutory requirement. *Popenhagen*, 309 Wis. 2d 601, ¶¶12-13 & n.10, 57-61.

¶85    In *Popenhagen*, police officers obtained bank records of a person charged in a criminal case pursuant to a subpoena issued under WIS. STAT. § 805.07, the civil subpoena statute, when they should have proceeded under the criminal subpoena statute, WIS. STAT. § 968.135. *Popenhagen*, 309 Wis. 2d 601, ¶¶7-10. Section 968.135 provides for the production of such documents in the criminal context only on a showing of probable cause. *Popenhagen*, 309 Wis. 2d 601, ¶14. The police failed to present to the two subpoena-issuing judges an affidavit showing probable cause, and the judges did not make the determination of probable cause that § 968.135 requires. *Popenhagen*, 309 Wis. 2d 601, ¶7. Our supreme court concluded that suppression was a proper remedy for this violation of § 968.135. *Popenhagen*, 309 Wis. 2d 601, ¶¶14, 20.

¶86    The supreme court abrogated case law that formerly prohibited suppressing evidence that was obtained in violation of a statute when the statute did not expressly provide for that remedy. *Id.*, ¶¶64-66. Instead, circuit courts have "discretion to suppress or allow evidence obtained in violation of a statute that does not specifically require suppression of evidence obtained contrary to the statute, depending on the facts and circumstances of the case and the objectives of the statute." *Id.*, ¶68. The supreme court considered it pertinent that WIS. STAT. § 968.135 expressly authorized "[m]otions to the court, including, but not limited to, motions to quash or limit the subpoena." *Popenhagen*, 309 Wis. 2d 601, ¶¶36-37, 51. A motion to suppress was proper under the *Popenhagen* analysis because "[a] motion to suppress documents obtained by a subpoena issued in violation of … § 968.135 … is ... similar in nature" to a motion to quash or limit a subpoena. *Popenhagen*, 309 Wis. 2d 601, ¶51. The supreme court also pointed out that a

suppression motion is "germane to" the objectives of § 968.135, because, without the remedy of suppression, the safeguards contemplated by the subpoena procedure mechanism "would be meaningless." *Popenhagen*, 309 Wis. 2d 601, ¶54. In sum, by disregarding the requirement to establish probable cause, which was required in a statute that authorized motions to quash or limit subpoenas, the police undermined the purpose of § 968.135, creating the availability of the remedy of suppression.

¶87 We conclude that here, as with the probable cause requirement in *Popenhagen*, the prohibition on investigations contained in WIS. STAT. § 29.921(5) would be meaningless if suppression were not available as a potential remedy. The prohibition on investigations is an affirmative restriction on the warden's authority, and the warden plainly violated the restriction here. Further, § 29.921(5) does not reflect any different remedy for a violation.

¶88 It is true that WIS. STAT. § 29.921(5) does not contain a statement that is akin to the express authorization in WIS. STAT. § 968.135 for motions to the circuit court to quash or limit a subpoena, as noted in *Popenhagen*. But our supreme court in *Popenhagen* placed weight on the reasoning in two opinions of the U.S. Supreme Court determining that suppression was an unstated available remedy for the violation of a federal act, even though the federal act did not contain language similar to that in § 968.135 about the ability to file motions. *Popenhagen*, 309 Wis. 2d 601, ¶¶92-95 (citing *Nardone v. United States*, 302 U.S. 379 (1937) (*Nardone I*); *Nardone v. United States*, 308 U.S. 338 (1939) (*Nardone II*)). Further, our supreme court favorably quoted the significance that the U.S. Supreme Court in *Nardone II* attached to a statute that "'forbid[s] the acquisition of evidence in a certain way.'" *Popenhagen*, 309 Wis. 2d 601, ¶93 (quoting *Nardone II*, 308 U.S. at 340-41).

¶89 This raises the issue of whether there could be a valid rationale for the circuit court to exercise its discretion to determine that suppression is not appropriate. Even after Phelan makes a sweeping request for evidence suppression, the State in its brief on appeal fails to anticipate that we might reject any of the State's arguments. The State is silent on the issue of potential remedies. When we inquired at oral argument, the State's only response was to assert that the case should "probably" return to the circuit court for that court to ask itself "what now" because, the State asserts, the remaining evidence would be "overwhelming." To the extent that the State might have been able to develop an argument based on an application of the harmless error doctrine, it failed to do so.

¶90 The State's briefing also fails to address the status of the judgment of conviction if we determine that some evidence must be suppressed. At oral argument, the State asserted that the evidence that we determine must be suppressed amounts to only "a bit" compared with the remaining "overwhelming" evidence. This brief statement by the State does not address the potential significance of the specific evidence that should be suppressed and is not a developed argument that suppression of these specific pieces of evidence does not meaningfully limit the evidence available to the prosecution at trial. Accordingly, we reverse the judgment of conviction.

**CONCLUSION**

¶91 For all these reasons, we conclude that the circuit court properly denied suppression of the evidence obtained by the warden before he asked Phelan to get out of the pickup as well as the evidence obtained by the deputies after they arrived on the scene. We also conclude that the court erred in denying suppression of the warden's solo investigation of impaired driving. Accordingly, we reverse

the judgment of conviction, and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.

Recommended for publication in the official reports.